May it please the Court, Mark Drozdowski from the Office of the Federal Public Defender for Petitioner Appellant Martin Kipp. If Martin Kipp was on trial in Orange County for two murders, one unadjudicated, he was on trial in Los Angeles, not just for his actions, but for his words, words protected by the First Amendment. I would like to begin by discussing the certified claim that Kipp's constitutional rights were violated when the trial court admitted evidence of his favorable views of Satan. Two of these statements came in at the guilt trial. The district attorney emphasized one of them in his closing and said it showed that there was evil in this world, evil in this very community. Three more statements came in at penalty, and the district attorney read two of them in his penalty closing and concluded by saying that Kipp had Satan in his soul. Our claim is based on Dawson, which held that the First and Fourteenth Amendments banned capital sentencing evidence of a defendant's association in a gang or speech or religious beliefs where the evidence has no relevance to the issues being decided and proves nothing more than the defendant's abstract beliefs. This claim was raised on direct appeal, and Kipp cited Dawson and six other Supreme Court cases, responded to not reply to Kipp's Federal claims, but instead just focused on the State claims, and so did the State court opinion, which doesn't mention the Federal basis of the claim at all. Under Johnson v. Williams, we get de novo review. Even if the Court disagrees with that, this claim is reviewed de novo on prejudice because the State court never reached the question of prejudice. Now the Attorney General does not dispute that Satanism is religion protected by the First Amendment or that speech about Satan is so protected. He has argued that there was never any attempt by the prosecutor to portray Kipp as a Satan worshiper, but that's belied by the record. Kipp's adoptive sister was a mitigation witness at penalty. The District Attorney's first question to her on Cross after she asked for mercy was, what if Martin has rejected God and worshiped Satan? That's in the trial transcript at 4671. But the prosecution failed to present any evidence of Satanism, was in fact associated with this crime or connected to a lack of remorse or future dangerousness. The prosecutor failed to present any evidence of Satan at all, but instead just played to the jury's negative view of Satan, Satanists and their worst fears. So don't we have to draw a distinction between the guilt phase and the penalty phase on this argument? Because there was only, the reference to Satan in the guilt phase was not quite as extensive as it was in the penalty phase, isn't that right? That is correct. On the other hand, Martin Kipp's character was not at issue at the guilt phase and evil was not an element of any offense and the District Attorney argued. Well, are you arguing, I thought you were arguing that even the use of this Satan reference at the guilt phase when counsel got up there and argued and the letter was admitted was prejudicial. We are arguing that. We're arguing it was prejudicial at guilt, but also it carried over and was prejudicial at penalty. Yes, I understand that. Okay. I understand that. Yes. But they're really two separate questions as far as I'm concerned. I agree. That's correct. So what was prejudicial at the guilt phase about the reference when the issue was raised? As I've said, I think it's prejudicial because there is, defendant's character can be in play at a capital penalty phase, but it's not at the guilt phase. This doesn't go to an element of the crime that Martin Kipp is allegedly evil because of this statement about Satan. It had nothing to do with the issues that were presented and the prosecutor didn't present any evidence showing that it was. He never argued and there's no evidence saying that these offenses had any relation to Satanism. If you look at all the other evidence that was presented with respect to guilt, it was overwhelming. It was compelling. I think in the first argument, I think we have a similar situation here of why is a district attorney sort of piling on and bringing this evidence that is only inflammatory and not explanatory. The prejudice certainly carried over to penalty and particularly in a case where the majority of the jurors were Christian. We know that from the juror questionnaire, said seven were Christian, three had attended church regularly. We also know that from the declaration. I'm sorry. I just want to understand. Are you arguing that they should have been redacted? Correct. The defense attorneys argued for the redaction of the Satan references at trial. Right, but how would that have made a difference in the guilt? Let's just take the guilt phase for example. Well at guilt... How would the outcome have been different? Right. Well, we know the prejudice at guilt by taking the district attorney at his own words when he closed, his guilt phase closing went over two days and at the end of the first day is when he read the statement from the letter. And then he came back the next morning and if you're a sports fan, it's almost like he's giving play-by-play commentary. He comes back the next morning and says, I could see from the look in your eyes how distressing that letter was. And the defense lawyers too in their closing talk about this is the single worst piece of evidence in the case. So I think this goes to... It's not just... You're talking about the letter? The letter and particularly how the district attorney used the references to Satan in a case where we have a majority Christian jury, which he knows from the questionnaires that were filled out. But if the case, if the evidence was weak, I think you would have a stronger argument here. The evidence as to guilt was pretty overwhelming. His fingerprints, his pawning of the victim's belongings, the fact that in the letter he said he described how he killed, raped, sodomized, beat, swore and laughed at the victims. Isn't that much, much more compelling than the couple of Satan references contained in those letters? To Christians, Satan is the enemy of good and of man. And we have clearly something that is not tied to the crime as Dawson requires. It's superfluous but inflammatory. How is it not tied to the crime when he's... It's a confession. I killed, raped, sodomized, beat, et cetera, these women. How is that not tied to the crimes? The reference to Satan is not tied to the crime. Well, yes, I understand that, but I don't think that was the question. The question was, you know, why wasn't that... How do you overcome those references going to his guilt? If you take out the Satan, two references, how does that affect the outcome? Right. Well, we also have, in the same closing, we have the district attorney making what the California Supreme Court concluded was an improper play for sympathy for the victim. Now they found that harmless, but what we have in the closing at guilt is improper sympathy for the victim and improper antipathy for Mr. Kipp based on the Satan statement. So those are interlocking, and that's part of our cumulative error claim as well. Now, pre-trial, the defense had asked for the information to be redacted. And was the trial court's ruling that they would not come in at the guilt phase but only at the penalty phase? That is correct. And so then counsel then made the strategic decision that if it was going to come in at the penalty phase anyway, I want the letters or the references to come in at the guilt phase as well? Was that what happened? I think counsel wanted to front load it to try to take the sting of it. Importantly, though, the evidence never would have come in at all if the court had made the correct conclusion under Dawson. But Your Honor is correct. That's how that was the decision they made. If I can move on to the penalty phase, there are additional references, correct? Yes. At penalty, we have two more references he reads from the September 9th letter. And you know here what's significant, too? This is the district attorney is not just summarizing evidence that was previously presented. He's actually presenting the evidence in these closing arguments. And in closing is when the jury first heard these letters read, first heard the words, and this Court is recognizing Zapata v. Vasquez that that highlights, magnifies the power and the prejudice of statements like this. The prosecutor also encouraged the jury to read the letter for themselves and at guilt. The jury asked for the letter before it had even been redacted and sent to them. Which letter did they ask for? At the guilt phase, the September 15th letter that the prosecutor mentioned in his closing, the Court, after the closings were done, the Court was still had to read the letter. And even before the Court could get the letter done and sent off to the jury, the jury had requested the letter, which I think shows the focus they had on that. We've already, another aspect of the prejudice here, and we've discussed it at penalty, where the letters were used as a basis for the prosecutor's conclusion toward the end that Martin Kipp had Satan in his soul. And because of the wrongful admission of the Satan references too, this resulted in the jury learning about the prior death judgment. Again, defense counsel thought they had to mention that through the testimony of Craig Haney to try to explain why Mr. Kipp had written these letters. Now, despite the wrongful admission of this evidence, the jury deliberated for three days before returning a death verdict, showing it was a closed case and then any error could have been prejudicial. I'd like to move on, I'd like just to mention one thing about the letters. We have an associated ineffective assistance of counsel claim, and I'm not sure my briefs were clear enough about this. That was alleged to excuse any procedural default, but there was no procedural bar here. The California Supreme Court never found a procedural bar on this claim. The Attorney General never argued procedural bar in state court or procedural default in federal court. So the ineffective assistance claim, we just don't need it on the letters claim because there is no default on that. I'd like to move on to the juror misconduct claim, which is related to the Satan evidence, which is that a juror read from the Bible to fellow jurors during penalty deliberations to help them decide whether Mr. Kipp should live or die. She read the phrase, an eye for an eye, which licenses death as the punishment for any murder, contrary to Supreme Court law that the death penalty is not automatic. But is that balanced out by the reference to judge not lest you be judged reference? No, that's a more ambiguous reference, and by then they actually had judged Martin Kipp. They had found him guilty of murder and returned to special circumstance. So I don't think it's balanced out. Again, we have the majority of jurors here were Christian. The prosecutor presented Mr. Kipp's favorable views of Satan, which the prosecutor emphasized in both the guilt and penalty clauses. So let me ask you this. Is the misconduct bringing the Bible itself into the jury room, or is it the reading of the two scriptures, the two verses? It's both. This case has more prejudice than cases where the Bible is read outside the jury room, because here when the Bible is read in the room, the statement has more status, right? I mean, the person is not just reading it. You don't have to believe me. Believe the Bible, the word of God to Christians. So it enhances. Suppose she hadn't brought the Bible in, but the juror, you know, I've studied the Bible all my life, and I live my life by, you know, what's in the Bible, the principles and the values, and just blurts out in the jury room, an eye for an eye. Right. Is there anything, is that juror misconduct? It is. You're describing pretty closely, I think, the Hearst case from the Fourth Circuit that we mentioned in our supplemental reply brief, where the court, the Fourth Circuit, remanded for an evidentiary hearing. And the fact pattern there is that a capital penalty juror goes home and asks her father that night, is there anything in the Bible that would help me make this decision? And he gives her the passage, an eye for an eye, and she reads it that night. And the next morning she goes in to deliberate. She doesn't take the Bible with her. And she goes in to deliberate, and the Fourth Circuit held that the state court decision, the state court denial without an evidentiary hearing was unreasonable under Maddox and Remmer. Ms. Bakke described the law that applies to these claims. And that the state had not made, rebutted the presumption of prejudice, and therefore, it remanded for an evidentiary hearing in district court. And I think that's the right outcome here. And our claim is stronger because the Bible is actually read in the jury room. Our circuit hasn't, I mean, because we have to determine whether there was extrinsic evidence, so, right? And then whether it was prejudicial. Yes. And our circuit hasn't accepted, or we don't have a case saying that the Bible is this kind of extrinsic evidence contemplated by this Maddox-Remmer framework, have we? Well, the cases I've seen have denied, haven't resolved the question of misconduct, but have denied the claim for lack of prejudice. Fields, I think, is one of those cases. And so, I don't think there's a decision that this panel would be contradicting. I just don't think it's been reached. And Fields is different from here because the California Supreme Court there called Fields' case among the most aggravated. He was convicted of a robbery, murder of one woman, robbery of a man at gunpoint, kidnapping, robbery, rape, and forced oral copulation of three more women. And he had previously been convicted of manslaughter. And his penalty jury deliberated just one day, whereas Kipp's deliberated for three, again, showing prejudice. Fields also, the juror, read the Bible outside the jury room and made a list based on the Bible and the dictionary of reasons for and against the death penalty. And there were 18 reasons. And an eye for an eye was one of the 18 reasons. Here, an eye for an eye is one out of two. It's not diluted. What if the juror just brought the Bible into the jury room and held it tightly? And then as the voting goes around, you know, here's my Bible and votes for death. Is that juror misconduct? Well, I would be afraid there that the Bible, the danger is it's a higher authority that can displace Supreme Court law. And the danger there is the validation. If you go around and vote and you say this is someone holds up the Bible while they vote for death, I think the message is still being sent. Of course, you know, our case is stronger than that. I would like to, unless... Assume that it's misconduct, you still have to get over prejudice, right? It's not an automatic reversal or not an automatic grant of a writ. Correct, but under the Remer Maddox framework, as described in Godoy, there's a presumption of prejudice that arises from this kind of external influence. And it's the State that bears a heavy burden of rebutting the presumption. And the State hasn't done that. They did it in the State court. Their only argument was that Ms. Rivers' declaration was not credible. Now, that's not a reason to deny a claim, at least without an evidentiary hearing. So if there's any questions about the prejudicial effect, and Godoy says this, then you can hold an evidentiary hearing. And Godoy granted an evidentiary hearing in a case where the declaration... What would be the question at such an evidentiary hearing? What would the district court have to decide? Did this really happen? We allege it happened and it happened this way. Is there more evidence about the statements were made? Can we get more information on when the statement was made? This declaration, the jury deliberations were for three days. We don't have that in this declaration. I don't think it prevents us from going forward, but that might be more information. The State argues, well, there's some other juror declarations and they don't mention this. Well, they also don't say it didn't happen. And I think there's declarations from four of the jurors. So there's other people out there. And this is what an en banc panel of this court did in Godoy. But here, we have to review whether or not the State's determination that this wasn't prejudicial was an unreasonable determination, right? Because we're under AEDPA review. Correct. We have a silent denial and it's assumed to be on the merits. But again, I think Godoy provides the answer because even under California State law, they're supposed to apply a presumption of prejudice and it was not rebutted here by any other contrary evidence by the State. So we have contrary to Maddox and Remmer right there, which gets us to Novo Review. Well, do you look at, let me, in deciding whether or not the presumption has been rebutted, do you look at all the other evidence that was, the aggravating circumstances that were presented at the penalty phase? How do they fit into the prejudice analysis? No, I think that's right. I think if the court, if the question is, ultimately, if the question is, is there prejudice, that's what the court gets to. But before you get there, under the presumption of prejudice under Godoy and Maddox and Remmer, that hasn't been rebutted yet. But I thought the first question. Ultimately, we may need to get there. I thought the first question to ask is whether the conduct was possibly prejudicial. That's correct. Once you get, yes. Well, but I mean, but help me understand this. I mean, here, don't we have to examine whether it was unreasonable for the State Court to determine whether the conduct here was not possibly prejudicial? I mean, that we. Correct. We have to say, was that unreasonable for the State Court to say it wasn't possibly prejudicial? There's a threshold to meet for the presumption of prejudice to attach, but it attaches quite readily when there is an external influence brought in into the courtroom. As the attorney general in the Orange County case acknowledged in state court that the bringing in of the pants and the pamphlet, that they agreed there that that was misconduct. Now, if a pamphlet on cocaine is misconduct, I think certainly a Bible is when it's come in, it's brought in to read an eye for an eye to decide whether a man should live or die. That's not, I mean, that's you're talking about whether it was extrinsic. I'm asking what do we do after we determine if it's extrinsic evidence and how we review this matter and here on the prejudice, that's where I want to understand your position. And I think Godoy says, first ask whether the conduct was possibly prejudicial. And so we have to determine whether or not the state court was unreasonable for the state court to determine that the conduct was not possibly prejudicial. Am I right? I'm asking more than I'm stating. So I just want to know, is that the right analysis? I think that sounds right. So if that is correct, tell me again, because this is your opportunity, why the state court was unreasonable in saying that this was not possibly prejudicial. I mean, we have to determine that's under the EDPA analysis. That's where we are, isn't it? Right. And I would bring us back to Hearst, the Fourth Amendment, I'm sorry, Fourth Amendment, Fourth Circuit case that had a situation that was not even, not as pronounced as here, and they reached that conclusion that when someone went home and read an eye for an eye from the Bible, and the next day and brought that in and shared it with the jurors, that the state court's silent denial of that claim was unreasonable under Maddox and Rembrandt. And certainly it's unreasonable here where you're physically bringing the Bible in to read that phrase and increasing the status of the statement. In that case, was there countervailing quotes, as in this case with the judge, not lest he be judge quotation? My memory is that the only statement in that case was the, no, I don't think there was another statement aside from. And doesn't that make this case different? It does make it different, but I, our phrase is so, so pro-death penalty and against Supreme Court law that I don't think you can unring the bell of it, and certainly not when there's just one other statement. It's not like fields where there's 18 statements. That's a more diluted situation. I would like to briefly discuss our ineffective assistance of counsel claim, a penalty, if I may, quickly, because I think it's important not just for this case, for Orange County. I don't think there's, I don't think the court can say that there was no prejudice in the other case because here more mitigation was presented. I'd like to briefly talk about that. As we know, this is not a case where trial counsel presented no mitigation. There were 30 defense penalty witnesses and success experts, only one of whom actually spoke with Kip. But the evidence was really generic about life on the Blackfeet Reservation. It did not explain the unique circumstances of Kip's upbringing. And this allowed the DA to make his parallel lives argument in closing, that other people on the reservation had been able to overcome adversity. Why couldn't Mr. Kip? But Mr. Kip's lawyer wasn't presented, that counsel should have presented. That's not cumulative of what, because it was a very compelling mitigation case that was ultimately presented. So what's missing here? Well, the omissions were material, material, and they pointed, painted a much more poignant picture. One is Kip was beaten from birth to the age of 22 by his father, Curley Carpenter. The jury didn't hear that. They didn't hear his natural mother hit him, too. They didn't hear that Kip's father locked him in a shed to punish him, that his mother drank alcohol while pregnant with him, that he drank alcohol left over from their parties to the point of passing out, a child under 22 months, and that he drank feces and urine out of a slop bucket. Joseph still smoking, his older brother, five years older, six years older, and his cousin, Kenneth Wayne, still smoking, could have testified to that, but they were never contacted by the defense. Another piece of information was that the jury didn't hear that Kip saw his natural father beat his natural mother or that his adoptive father, John, beat his mother in front of him. And again, Joseph still smoking says, I and the other kids witnessed my father beating my mother many, many times. We screamed and cried hysterically. This matters in a case where the jury had to assess the moral culpability of a defendant found guilty of violence against women. And the Porter Supreme Court case focused on that in finding prejudice under 2254D. Third, and I think the court already mentioned this in the other argument, the beatings and violence by John Kip started much earlier in Martin Kip's life than was presented at trial where they said this basically started when Martin was 15 or 16. And there were only three instances of physical abuse by John Kip mentioned at trial, and There are much more going on here, including John tying Martin's hands to a crossbeam on a barn and putting a gun to his head and pulling the trigger and when no bullet fired, then beating him with a whip. And Wayne Juneau was able to talk about that, but he was never contacted by the defense. And he said at the Orange County evidentiary hearing, he was 10 years old when he saw this. Martin was four or five years old. Jury didn't hear that. So there were specific instances in addition to what could have been presented. But there was a lot of evidence presented in each of these categories, right? The physical abuse, the use of alcohol by his birth mother, and so forth. Was there anything that was qualitatively different that would fall within a different bucket, so to speak? But details matter. We know this from the Supreme Court cases. Ron Pilla's father locked him in a pen, in a dog pen. The Supreme Court thought that was important enough to put it in its opinion. There are other examples like that from the Supreme Court cases. I do see I'm running out of time, and I would like to preserve- I'll give you a couple of minutes for- I appreciate it, thank you. Let's hear, we can hear from the state now. Good morning, may it please the court. Deputy Attorney General Randall Einhorn on behalf of Appellee Respondent. Turning to the certified claim regarding the references to Satan in the two letters. The issue here is not about religion. The prosecutor didn't introduce evidence of Kip's religious beliefs or group association and ask the jury to make some sort of inference therefrom. There's no expert testimony on Satanism. The prosecutor introduced Kip's own words in letters he wrote, admitting the crimes in graphic and vile language and explaining why he killed these young women and that he enjoyed it. And there was no reason to sanitize Kip's own words. Kip invoked the ordinary meaning, if you will, of Satan as a cultural reference to evil, as he apparently fancied himself a bit of a bad boy. And certainly, as Judge Wynn noted, in essence that the word Satan was not the most offensive parts of these letters. The letter was compelling because it was Kip admitting to killing these two women, how he did it, and why he did it, and that he liked doing it. That was the purpose of why they were ultimately, at least the first one that was admitted to September 15th, is that the one? Yes, the 915 letter. Yes. In the guilt phase. Yes. Right. Yes. And it was powerful as the prosecutor referenced. Well, that part of it, the confession part is certainly powerful. But what relevance does the Satan reference have? Why not just agree to redact that reference? Well, these are his own words. There's no reason to clean it up. He, in essence, said he commented that he killed these victims and that Satan was licking them up and laughing at them. In essence, it almost tied into the circumstances of the crime as possibly why he did it. And with respect to- Well, there was no evidence regarding that he believed in some sort of a religious organization or whatever that Satan was- Right, absolutely. There's no evidence of that. Right. Any signs that the murder was committed in such a way that- No, that's- This is satanic. That's correct. It was just sort of the, as I mentioned, sort of a general euphemism for evil. And he was rebellious. He was, I think at that time, he wanted to be a heavy metal rock star. It just tied into the whole image that he was going and just his anger and as- The statement, we are coming home, Satan, or Satan, we're coming home, I'm paraphrasing, was that admitted in the guilt phase? That was in the- Yes, that was in the 915 letter and it would not have been admitted in the guilt phase, but as we talked about earlier, counsel wanted those references admitted at the guilt phase. That was allowed to come in at the penalty phase to rebut the intended and what turned out to be the good character evidence and also to show lack of remorse and future dangerousness, which I'll get into in a minute, too. Once a defendant puts his character in evidence at the penalty phase, the prosecution may properly rebut with evidence or argument suggesting a more balanced picture, and that's exactly what happened here. The California Supreme Court could reasonably conclude that the references were properly admitted or to be considered by the jury as being, bearing on Kip's claim's feeling of remorse and repentance at trial, and that remorse came in via Dr. Haney's testimony in the penalty phase. The prosecution offered Kip's own words and permissibly argued reasonable inferences, and with respect to the future danger- Yeah, just some sort of abstract reference, though, to- I'm sorry? Satan, an abstract kind of reference to Satan- In a sense. Equates with evil. More of a sort of a just a cultural colloquialism, if you will, or just sort of a is really just a reference to, cultural reference to evil, and that he had no goodness in his heart, which is what the prosecutor was getting to when he used it in closing. And the California Supreme Court could also- He had no goodness in his heart, or did he say he had no goodness in his heart and Satan in his soul? I don't think he said he had no goodness in his heart. He said he had Satan in his soul. He said- It was a definite reference to Satan, not just that he didn't have goodness. Right. No, he did say he had Satan in his soul, but I was suggesting that what he meant is he had no goodness. It was used not in a religious context, so to speak, but more in just a general notion of evil. Where in the record did the California Supreme Court determine that a favorable view of Satan is generally understood as a symbolic rejection of good values? I don't know if that's in the state court record. I think it seemed to be, if my recollection is correct, the district court was interpreting what the state court could have reasonably concluded. Well, I guess, I mean, if there's nothing in the record, then how do- general understanding, you know, is this supported by evidence or by law? I mean, the state court cited two cases, I think it was, as part of its opinion, neither of which I think supports the statement that a favorable belief in Satan is equivalent to immoral character. I would suggest that it was just the court reasonably found that it was invoked in its ordinary meaning of just a cultural reference to evil and just in a more general sense. And that was just a reasonable, the court, this court looks to whether there's any reasonable basis on which the California Supreme Court could have found it improper. And it also, because Kip introduced evidence in the penalty phase that lifers had a propensity to become model prisoners, the prosecution could rebut with evidence of future dangerousness if sentenced to life without parole, including the writing in the 9-9 letter where he said he felt Satan rejuvenated his energy to carry out his intentions to rape and sodomize every female deputy and gouge their eyes out in a terrorist killing. And again, the word Satan in that letter was hardly the most offensive part of his own statements as well. Furthermore, even if the references shouldn't have been introduced, it was harmless because the death sentence here didn't result from the word, from Kip using the word Satan. There was overwhelming aggravating evidence in here. The vulnerability of the victim, the horrific nature of the murder, the numerous other crips, excuse me, the numerous other criminal acts by Kip involving the attempted use of force or violence in his prior rape conviction. The de minimis references to Satan in his confessions and threats didn't have a substantial injurious effect on the penalty determination here. What about, what if you combine those references with the Bible? I was just going there. Yes. While the jury, the juror should not have read by, should not have read from the Bible and discussed it with the other jurors, the California Supreme Court could reasonably conclude that that conduct didn't rise to a level of a due process violation. Um, Kip points to no United States Supreme Court authority that holds that use of a Bible in deliberations is a constitutional violation. And respondent is aware of none. California Supreme Court, any trial court judge would say, sure, bring in your Bible. No, this certainly wouldn't be a instruction or direction, but no, in any way. Yes. It'd be completely improper to have a Bible in the jury room. In any case, I can't imagine it. Well, it's talked about in the brief, it's, and it's, it's a really a state court, Supreme Court cases that it's expected the jurors can consider their religious beliefs during penalty deliberations in order to make a moral assessment of the defendants mitigating evidence. And given the collective nature of deliberations, it's not improper that jurors may share that with each other. That was the Lewis case. People via Lewis at 26 Cal fourth. But well, I mean, if there's just, I mean, you know, I guess if there's discussion in the courtroom, I mean, in the jury room, people, we, we, at least I recall is that we were all trial judges at one point. And I, I, I recall that, that, uh, you know, I used to tell the jurors, you bring in a lifetime of experience and, you know, we don't ask them to drop their life. Accumulation of life values and experiences at the court, at the, at the courthouse door. Right. Right. I mean, they, but, um, you know, they are admonished that they're, they're duty bound to follow the law, uh, and the evidence. And there's no showing. And they're not to, they're not to consult other, you know, other sources and other, do their own investigation, conduct their own experiments. There hasn't been any showing here that the jurors rendered their decision based on this, this Bible, uh, uh, passages or Bible reading. And in that respect, the California Supreme Court could have reasonably concluded that the juror declarations, um, were admissible or inadmissible as attempts to impugn the jurors' mental processes and were inadmissible hearsay. And the, the, the phrases here really that we're talking about, um, an eye for an eye judge, not lest ye be judged, they're akin to colloquialisms and have sort of common meaning in, in culture, these particular ones, rather than a very distinctly, uniquely, um, religious context that people would really be unaware of. Does it make a difference though that the Bible was in the, in the jury room though in those statements? Does it make, the mere fact that... Yeah, the Bible was in the jury room. I think not. Why not? Because... Gives a little more credibility, right? Pardon? A little more oomph. You have, you have the Bible, you know, you're able to read from it. Suppose it depends on individual's viewpoints. It may or may not. I mean, um... What does it make a difference that a lot of the jurors were of the Christian faith? No. Why not? So if they were primarily of the Christian faith, and then you have the Bible, which reading from the Bible as guidance in terms of what to do, it all adds together, doesn't it? There's a wide spectrum of, of devoutness, for lack of a better term, for, for, because someone's Christian, whether they're, um, highly devout, whether they're not. I mean, counsel referenced, I think, three declarations where people said, assuming they're even admissible, that they went to church regularly. None of the others said that at all. And these, as, as you pointed out earlier, were really opposite ends of the spectrum, which sort of goes to the, the harmlessness here that, um, an eye for an eye and judge less, uh, not lest ye be judged, are really opposite ends of the spectrum in terms of proclivity and ruling for, for life versus death. And assuming it was misconduct, assuming the California Supreme Court found it was misconduct, it was state habeas, it was a silent denial, the court wasn't unreasonable in finding no prejudice, because, um, as the district court here talked about discussing Crittenden and Fields, which, which counsel talked about, there was much more extensive use and much more damaging quotes from the Bible, uh, involved there, and they were found not to be prejudicial. So really, in addition to the fact that there were very strong aggravating circumstances, as we talked about, uh, KIPP can't demonstrate that no fair-minded jurist could have found that the state court judgment here was, um... How does the, does the Bible at all relate to the, the references to Satan? It doesn't because the, um, there's no showing that the jury used the Bible to insert, to interpret Satan or interpret the references. They're really distinct, and, and this, this, uh, Satan wasn't pulled out of thin air and wasn't pulled out of, um, the Bible or brought up by, by a juror. It was, it was, again, KIPP's own words that were, that were there. So what do we do about the Fifth, Fourth Circuit case? I mean, do, does that instructive for us, the one, uh, your colleague across the aisle referenced regarding the Bible and what they found? Frankly, I'm not, uh, familiar with, with the case you referenced. The, the Fourth Circuit case that, that I had referenced in my brief was the Robinson versus Polk, which just... Yeah, but I'm talking about the one, so... I understand. You heard what he said. So why, why shouldn't we, um, go that route? My recollection, and I may have missed some of what he said, is that the, the, um, the Bible quotations there were more substantial and more damaging, yet they still found no prejudice. I'm not sure if that was what counsel relayed, but... I think it was, I mean, they sent it back for a hearing, I believe, based on the Bible references. Um, when the, um, evidence here was presented to the state court on habeas under state habeas law, it's, it's presumed correct. It's, it's presumed, it's, it's assuming as true what was alleged in the habeas petition. So assuming that was true, the state court here, um, found that either it didn't rise to a level of due process violation or that there was no prejudice. So there'd be no reason to send it back for any type of additional development because we have, um, we have the objective statements as what, what was reported by the jurors as to what, what the other jurors said. And I would also suggest that we talked a little bit about, or counsel talked about Godoy, um, with the Ninth Circuit case, which is, first of all, in this scenario, only United States Supreme Court precedent is, is controlling. And while Godoy talked about Maddox and Remmer, those dealt with claims, uh, brought at a hearing for a new trial motion, not a claim raised in, in state habeas here for the first time. Based in the record here and as noted by, um, respondent in its informal response in state court, the California Supreme Court could have reasonably concluded that any prejudice was rebutted. Turning to... You mean from the overall record? By the overall record. By the overall record, right? That's what they would have. By the overall record and whatever, um, uh, arguments we pointed out in our informal response as to why there was no prejudice. Of course, our, um, argument in our response was based on the overall record. Yes. Right. Turning to the ineffective assistance of counsel, as, as noted previously, the focus here should be on the reasonableness of what counsel did rather than what he could have and whether anything he could have done would have produced a different result. As noted, counsel presented an extensive mitigating case here involving dozens of witnesses. And as, as the district court correctly concluded in, in great detail, the areas that Kip points to as, as deficient were, were adequately covered at trial. And in addition to the extensive mitigating case with, with the dozens of witnesses, um, it was also presented extensive testimony that, that Kip again was, was a good person, deserved mercy. Here, like in Strickland, counsel's use of the mitigating evidence already in hand, which he had the, um, two years of, two years of investigation from prior defense counsel fell within the range of reasonably professional judgment. And moreover, even if he was, even if there was some deficiency, which there clearly wasn't, uh, there was no prejudice. Again, there was overwhelming aggravating evidence, uh, in this case, uh, Kip raped or attempted to rape four women and ultimately strangled two to death. The two he killed were only 19. And under these circumstances, any failure to put on additional specific instances of neglect was not prejudicial. None of that information would clearly change the balance in aggravation, uh, versus mitigation. Unless the Court has any further questions, Respondent Russ. Let me just, I want to make sure I understand your, your explanation of Godoy. I'm sorry? Okay. Well, Godoy. How does it fit? How does Godoy fit into our, our analysis? Well, my point was only United States Supreme Court authority is binding. Yes. And now Godoy discussed United States Supreme Court cases and Maddox and Remmer, but those were claims that were brought at a hearing for a new trial motion, not a claim on state habeas. On state habeas, Kip had the burden of showing that there was misconduct. And once he surmounted that showing, he had the burden of showing that the misconduct, uh, the rebuttable presumption was, excuse me, the presumption of misconduct was not rebutted. So he had a burden of, so he, his initial burden was showing there was misconduct, bringing the Bible in? On state habeas, yes. On state habeas. And if he, if he did that, then he had to thereafter show that the rebuttal, that the presumption of, the presumption of prejudice was not rebutted. Just to show that bringing the Bible in was possibly prejudicial. That's what, what we, the term we used in Godoy, possibly prejudicial. Then the burden shifts. As I understand it, it shifts to the State to rebut that. On state habeas, it's, it's, it's the Petitioner that has the burden. He has the burden of showing that there was misconduct, and then he has the burden of showing that the rebuttable presumption of prejudice has not been rebutted. So it's his burden as to both those prongs on state habeas, as opposed to this new trial hearing motion that was discussed in Maddox and Remmer. Well, there's a two-step test, and I want to make sure I understand the last thing you just said here. At step one, the Court asks whether the contact was possibly prejudicial, you know, meaning it had a tendency to be injurious to the defendant. If so, the contact is deemed presumptively prejudicial, and the Court proceeds to step two, where the burden rests heavily upon the State to establish the contact was, in fact, harmless. Do you agree with that? I'm reading. I would distinguish that from a state, from a habeas matter rather than a trial matter. Okay. Because I agree with that in the trial context, absolutely. But on state habeas, the Petitioner has the burden of both those prongs. He has the burden of showing that there was something that was misconduct, and then he has the burden to show that the prejudice was not rebutted. And what's the case for that? Well, I don't have a case for that. I just have that's just um But Godoy is a habeas case. But it's a case involving discussions about, well, Maddox and Remmer, which is a new trial motion. That's what we're talking about here. I mean, not a new trial, but this is the Maddox and Remmer framework that I just went over with you. Yes. Okay. I'm sorry. What did you say? I'm confused. You said it was a habeas matter, but it was a habeas matter addressing the underlying new trial motion. In Maddox. In Maddox. Or I think Remmer may have the same ones. Ours is just this claim was brought for the first time on state habeas. But we didn't seem to draw that distinction in Godoy. I guess all I would say is that that's not United States Supreme Court precedent, and I don't have the nuances of Godoy fresh in my mind as to that aspect. I have to think about that. So let me just clarify one more time on Godoy, because that was a habeas case. You're saying Godoy was wrongly decided? No, I'm not saying Godoy was wrongly decided. I was first pointing out that it wasn't a Supreme Court case, and then I was pointing out that the Supreme Court cases it discussed were hearings for a new trial motion where this juror misconduct claim was brought, as opposed to a state habeas, which is the venue where the juror misconduct claims were brought here. So I'm not saying that the shifting of the burden to the state isn't the same under those different procedural venues. Unless the Court has any further questions, respectfully request that the District Court judgment denying the habeas be affirmed. Okay. Thank you, counsel. We'll hear from them. You can put two minutes. Thank you. The California Supreme Court statement of the generally understood notion about Satan appears in the California Court of Appeals' reasoned opinion denying the claim. It's in excerpts of Record 178. It talks about the subordinate value system, and as we discussed, there was no evidence presented in the record contrary to Dawson on this. It's just the Supreme Court saying this. As far as there's been discussion about Godoy, and I think we're all reading from the same parts of it, but I will just add that when Godoy talks about the evidence being possibly prejudicial, it calls it a low threshold. And as the Court's already noted, the defendant must present just evidence of an external conduct that has a tendency to be injurious to the defendant, and we certainly have done that here. And in Godoy, they ordered an evidentiary hearing based on the declaration of one alternate juror. But again, but we're in habeas. Godoy was in habeas, too. I mean, at footnote 1 on page 961, the declaration was brought in habeas. Right. And so, but don't we have to look at the reasonableness of the State Court's decision to? That is correct. Did the State Court reasonably conclude that the State rebutted the presumption of prejudice, and the answer is no, just as in Godoy. Well, don't we have to say the State Court unreasonably made a determination regarding the first step. About possible prejudice. Yes. That's correct. We are under 2254d. So if you could, in the last time you have, why was that unreasonable with respect to the first step? We're bringing in external influence, right? Even in fields, this Court said, the core principles well settled. Evidence developed against the defendant must come from the witness stand. Here, they're relying on an outside influence, the Bible, the most powerful word to Christians to reach this penalty determination. That is at least possibly prejudicial. It's unreasonable to hold otherwise.  One final word, if I may, I see. Yes, this is it. This is it. As far as number of witnesses in Beemore v. Chappell, this Court held granted penalty phase relief on a mitigation claim, even though at trial they presented over 40 witnesses. It's the same setup here, a California Supreme Court summary denial. Unless there's any further questions, thank you. Thank you, counsel. I think our thanks go to all of you. It's a hard case. We appreciate your dedication and your work and everything. The matter is submitted.
judges: Paez, Murguia, Nguyen